Charles **SIZEMORE, D.D.S.,** Appellant,

v.

**TEXAS STATE BOARD OF DENTAL EXAMINERS,** Appellee.

No. 05–86–00189–CV.

Court of Appeals of Texas, Dallas.

Dec. 28, 1987.

Rehearing Denied March 10, 1988.

Robert W. Gauss, Austin, for appellant.

Joe Alfred Izen, Houston, for appellee.

HOWELL, Justice.

For prescribing narcotic drugs, primarily Percodan, where "not necessary or required," and for "grossly over-prescribing" those drugs, and for failing to make complete notations of narcotic prescriptions on the patients' dental records, the Texas State Board of Dental Examiners suspended the license of Charles W. Sizemore, D.D.S., for five years, all but 120 days of which was probated, and revoked his certificate to prescribe narcotics. The trial court upheld the Board's decision and he appeals to this court. We find that the revocation is not supported by substantial evidence and reverse.

The Controlled Substances Act requires that duplicate copies of all scheduled prescriptions be forwarded to the Texas Department of Public Safety by the pharmacist who fills the prescription. This case was brought to the Board's attention by the DPS after a routine review of duplicate prescriptions emanating from appellant's office. A staff investigator for the Board then went to appellant's office and examined his case files at length. The Board thereafter held a hearing and faulted appellant for his treatment of three patients:

(1) Danny McKay was treated by appellant for jaw pain. For eleven months, from September 10, 1981, to August 23, 1982, appellant gave McKay twelve prescriptions for a total of 280 tablets of Percodan, a Schedule II controlled substance.[1] Appel-

---

1. Percodan is a trademarked product of DuPont Pharmaceuticals, Inc. *Physician's Desk Reference* 409, 860–61 (40th ed. 1986) (*PDR*). The tablets are bright yellow and are sold by the manufacturer in packages ranging in size from twenty-five to 1000 tablets. Each tablet contains 4.50 milligrams (mg) of oxycodone hydrochloride, 0.38 mg of oxycodone terephthalate,

lant noted only two prescriptions for a total of 50 tablets on McKay's dental record.

(2) Roxanne Sabato Schultz sought treatment for dental problems that appellant concluded were complicated by the presence of infection. For over five months, from January 4 through June 16, 1983, appellant gave Schultz thirteen prescriptions, eleven for Percodan and two for Tylox, also a Schedule II substance, for a total of 220 tablets, omitting to note four of those prescriptions totalling 60 tablets on Schultz's records.

(3) Kenneth Cook received 21 prescriptions for a total of 382 tablets of Percodan from appellant over a five-month period from December 28, 1982, to June 2, 1983. During this time, appellant prescribed 121 tablets over a period of less than two months. However, the record keeping with respect to patient Cook is unchallenged.

By its order, the Board made, in substance, the foregoing findings of fact and then entered the following "conclusions of law":

1. Dr. Sizemore is guilty of prescribing controlled substances not necessary or required in the practice of dentistry and where the prescription and use of such would promote and further addiction in violation of Article 4551h.

2. Dr. Sizemore is guilty of dishonorable conduct in that he grossly over-prescribed narcotic drugs in violation of Article 4549, Section 2(c), as defined by Board Rule No. 382.19.21.001(8).

3. Dr. Sizemore is guilty of failing to make the prescription of narcotic drugs a part of his patient's dental records as required by Board Rule No. 382.19.15.-004.

We hold that the conclusions in the first and second paragraphs are not supported by substantial evidence.

It is to be noted that conclusion number one is in the conjunctive, but the statute is in the disjunctive, to-wit:

> It shall be unlawful for a dentist to prescribe or deliver to or for any person ... any controlled substances not necessary or required, or where the use or possession of same would promote or further addiction thereto, ....

TEX.REV.CIV.STAT.ANN. art. 4551h (Vernon Supp.1986). We would be required to uphold conclusion one if we found substantial evidence that the prescriptions were either (1) not necessary or required, or (2) promoted or furthered addiction. However, there is no substantial evidence to support either part of the Board's first conclusion.

The Board's only witness was Dr. Arthur H. Jeske. His testimony related to the propriety of appellant's drug prescriptions. He based his testimony upon his review of appellant's treatment records. He neither interviewed nor examined the patients themselves. The patients were not called. Neither did the Board's investigator testify. Patients Schultz and Cook suffered from oral infections, which appellant treated with antibiotics. Patient McKay suffered from an ailment associated with the temporal mandibular joint in his lower jaw, known as TMJ.

On direct examination, Dr. Jeske expressed his expert opinion that appellant's prescriptions exceeded the "generally accepted dosages" for dental treatment, but on cross-examination, he made several significant qualifications to this testimony. He also testified that, in his opinion, anoth-

and 325 mg. of aspirin. *Id.* at 860. By way of comparison, the standard aspirin tablet contains 5 grains or 324 mg. of medication. *Taber's Cyclopedic Medical Dictionary* (F.A. Davis Co., Philadelphia, PA 1949 Ed.) p. A–101.

While quantitatively minor, the oxycodone components represent the major medicinal value of the tablet. Oxycodone is a semi-synthetic *narcotic analgesic with actions qualitatively similar to morphine.* The principal therapeutic values are analgesia (pain relief) and sedation (sleep inducement). Oxycodone is similar to

codeine in that it retains at least one-half of its analgesic activity when administered orally. *Id.* at 860–61.

*PDR* states, *"Indications:* For the relief of moderate to moderately severe pain." *Id.* at 860. It states that ambulatory patients should be cautioned that their ability to drive a car or operate machinery may be impaired while under the medication. It states that the medication should be given with caution to the elderly or the debilitated. *Id.*

er course of treatment not involving analgesics would have been more suitable for patient McKay. He further testified by way of conclusion that the course of medication given "could promote or further addiction;" there was no testimony that it *would* do so. Neither did he give any specifics; he failed to state what dosages, if any, would have been the maximum safe and proper amounts under the conditions shown.

Appellant's testimony was that all drugs prescribed were reasonably needed for the proper care and treatment of the patients. He testified that Mr. McKay had been a regular patient for several years prior to the onset of TMJ problems. Mr. McKay repeatedly came to appellant's office unannounced and without prior notice complaining of intense pain. Appellant would interrupt his schedule, would briefly examine him, would prescribe Percodan to relieve the symptoms, and would provide Mr. McKay with an appointment for treatment. Thereafter, Mr. McKay usually broke the appointment only to repeat his emergency appearance when pain again manifested itself. Appellant testified that he would have refused to treat patient McKay long before he did sever relations with this patient except for the established relationship.

Concerning patients Schultz and Cook, appellant testified that they both had teeth that were badly infected and painful when they first consulted with him. The teeth could not be successfully treated and prostheses applied until the infections were cleared up. Antibiotics were prescribed and, pending the clearance of the infections, Percodan was prescribed for the control of the pain. Following the disappearance of the respective infections, dental restorations were completed and the patients were released.

Appellant testified that none of the patients was in danger of addiction. He testified that he instructed them each not to take more than four tablets of Percodan in any twenty-four hour period. The average usage by each patient was much lower. Appellant testified that the early warning

sign of drug dependency is a patient who consumes the prescribed medication at the maximum allowable rate or faster and who immediately demands an additional prescription. As appellant demonstrated from the State's exhibits, all of the patients voluntarily refrained from usage at or near the maximum prescribed levels indicating, according to appellant's testimony, an ability to engage in self-control and a healthy attitude toward narcotic drugs.

It is not our province to weigh the evidence. The only question before us is whether the testimony before the Board constituted substantial evidence in view of the nature and purpose of the proceedings being had. In other words, was there a sufficient basis in the evidence for the Board to conclude that appellant's license to practice dentistry should be suspended or revoked or that he should be otherwise disciplined? We conclude that the evidence contained no such basis.

■ Before analyzing the evidence further, we first consider the standard to be employed.

> [T]he practice of dentistry is a lawful profession, . . . . [T]he right or privilege to engage in it, once it is lawfully acquired, is a right or privilege protected by the due process clauses of the state and federal constitutions . . . .
>
> * * * * * *
>
> The right to practice a profession has been called a property right, but it is more. . . . There is moreover a prestige and good name and should be a pride attached to the practice of an honorable profession superior to any material possessions. To cancel a professional license is to take the entire capital stock of its possessor and to leave him in most instances the equivalent of a bankrupt. But it does much more than this; it takes from him his professional standing and in a manner whatever good name he has, which leaves him poor indeed.

*Francisco v. Board of Dental Examiners,* 149 S.W.2d 619, 622 (Tex.Civ.App.—Austin 1941, writ ref'd) (quoting *Waller v. State,* 68 S.W.2d 601, 605 (Tex.Civ.App.—Amarillo 1934, writ ref'd)).

Arrayed against the interest of the individual is the interest of the public. The public must be protected from negligence, incompetence and wilful misconduct in the practice of the profession. *Texas State Board of Dental Examiners v. Fenlaw,* 357 S.W.2d 185, 189–90 (Tex.Civ.App.—Dallas 1962, no writ). However, due process places limitations upon the power to regulate, that limitation being the legitimate interest of the public in controlling the conduct of the individual practitioner. *Waller v. State,* 68 S.W.2d 601, 603–04 (Tex.Civ.App.—Amarillo 1934, writ ref'd). His license may be revoked or suspended or otherwise restricted only upon proof of conduct injurious to the public welfare; proof must be made of negligence, incompetence, or wilful misconduct. Even though the applicable statutes and rules do not expressly provide to this effect, we must construe them as implying such a requirement, else they offend the constitution.

■ We also point out that an action of this nature is necessarily punitive in effect. *State Board of Dental Examiners v. Neeley,* 574 S.W.2d 244, 245 (Tex.Civ.App.—Austin 1978, no writ) (dental practice disciplinary statutes "are penal in nature and should be strictly construed"). Indeed, professional misconduct proceedings have been described as quasi-criminal. *In re Ruffalo,* 390 U.S. 544, 550–51, 88 S.Ct. 1222, 1225–26, 20 L.Ed.2d 117 (1968) (attorney disbarment). It follows that evidence of conduct injurious to the public welfare must be substantial.

We must bear in mind that the amelioration of human illness, disease and disability is at most an inexact science. It is commonly referred to not as the healing *science* but the healing *art.* Legitimate differences of opinion as to the proper course of treatment are commonplace. As long as the difference was legitimate, the fact that the Board's expert, Dr. Jeske, or the Board itself did not feel that the course of treat-

ment was "proper" did not constitute a ground for the imposition of sanctions.

■ Turning to the legal grounds upon which the Board found against appellant, we hold that article 4551h proscribes the improper administration of narcotics without respect to quantity; that is, article 4551h does not address the question of grossly excessive quantity. On the other hand, Board Rule 382.19.21.001(8) proscribes the administration of grossly excessive quantities of those drugs. Texas State Board of Dental Examiners, 22 TEX.ADMIN.CODE § 109.211(8) (Hart 1986).[2] The Board itself implicitly but necessarily made the foregoing determination in the adoption of its rule. Obviously, the Board has no power to add to or detract from a statute. By adopting a rule pertaining to the subject, it must be considered to have made the administrative determination that the statute did not speak to the problem of prescribing in grossly excessive quantities.

■ With the foregoing standards in mind, we review the testimony of the Board's witness, Dr. Jeske. He readily admitted that he knew nothing of the patients except as reflected by appellant's records. With respect to patient McKay, he testified that he had "generally ... observed" that TMJ pain "responds better" to a non-narcotic course of treatment consisting of "anti-inflammatory [drugs] and splint therapy." He conceded that TMJ patients can experience "very severe pain," and that if a TMJ patient does experience such pain, then it "may be necessary" to use Percodan. Although Jeske stated that such an instance would be "an exception, I would say," he was unable to be specific with respect to patient McKay, never having interviewed or examined him. He further agreed that the amount of pain relief to which a TMJ patient is entitled is a matter of the dentist's subjective judgment. He also agreed that "there is a lot of controversy in TMJ treatment."

**2.** The above-cited rule provides as follows: "Unprofessional conduct, dishonorable conduct, and immoral conduct are synonymous terms when applied to the conduct of a licensee and include the following: ... (8) grossly over-prescribing or dispensing narcotic drugs, dangerous drugs, or controlled substances...."

With respect to patients Schultz and Cook, whose conditions were similar to each other, Jeske conceded that infections must be controlled before procedures such as root canals are commenced and agreed that narcotics might be necessary to control pain while antibiotics are being administered. He agreed that "in some instances," Percodan might be an acceptable medication for these patients and conceded that without seeing the patients, he could not state with reasonable certainty that Percodan, in any amount at all, was neither necessary nor desirable.

Rather, Dr. Jeske centered his criticism on the duration of the courses of treatment that consisted of antibiotics plus Percodan. Tissue cultures should have been obtained and analyzed or the patient referred to an oral surgeon, he testified, unless a response manifested itself at an earlier date. Appellant's position was that he was of the opinion that responses *were* manifesting, although slowly. It is significant that Dr. Jeske wholly failed to testify that no reasonably competent practitioner similarly situated would have continued the same course of treatment for an equivalent period of time. Without testimony to such effect, Dr. Jeske's testimony amounts to no more than a legitimate difference of opinion as to the proper course of treatment.

In the context of a license revocation proceeding, we hold that testimony of the foregoing nature was insufficient to qualify as substantial evidence of any violation of the first two of the above-quoted prohibitions of article 4551h. That is, the Board failed to present evidence that was clearcut and reasonably free from doubt to the effect that appellant was "guilty of prescribing controlled substances" neither (1) "necessary" nor (2) "required" to the extent that the public welfare would be threatened if such conduct were to continue unchecked. In order to prove a punishable violation of these provisions, there had to be evidence, apart from evidence as to frequency and duration, that the medication was not needed or that it was, for some specific reason, contra-indicated, and that any reasonable practitioner, similarly situated, would have been aware of such effect. The first "not necessary or required" portion of conclusion number one must be set aside.

Conclusion number one further held appellant "guilty of prescribing controlled substances ... [in a manner that would] promote and further addiction." It is common knowledge, and discussions before the Board so indicate, that any administration of narcotics whatever *could conceivably lead* to addictive problems. Such drugs are virulent; they are contra-indicated whenever less toxic medications promise to be effective.[3] However, they remain as accepted pharmacology because of their extreme effectiveness in the alleviation of human suffering. Dr. Jeske conceded that, not having seen the patients, he could not state with assurance that appellant absolutely should not have prescribed Percodan in any quantity whatever. Elsewhere, he gave his testimony by way of conclusion that appellant prescribed the substance in a manner "that *could* promote and further addiction." But, the identical statement may be made in *every* case where *any* quantity of a narcotic drug is administered. Certainly, the "promote and further" provision of article 4551h does not warrant license revocation in every instance involving the administration of narcotics.

What is the dividing line between the permissible and the impermissible administration of narcotics? We hold that there is no punishable violation of the "promote and further" restriction of article 4551h unless evidence of negligence, incompetence or wilful misconduct is presented to the Board; the drug must have been

---

3. *Physician's Desk Reference* contains a plain warning that Percodan may be habit-forming and states:

> Oxycodone can produce drug dependence of the morphine type and, therefore, has the potential of being abused. Psychic dependence, physical dependence and tolerance may develop upon repeated administration ..., and it should be prescribed and administered with the same degree of caution appropriate to the use of other oral narcotic-containing medications.

*PDR* at 860.

administered in a manner that would not have been undertaken by any reasonably competent practitioner similarly situated. Such proof must be substantial; the conduct must be injurious to the public welfare. Dr. Jeske's unembellished testimony that, in his opinion, without seeing the patient, appellant prescribed the drug in a manner that *could* promote and further addiction because the witness considered that the courses of narcotic therapy lasted "longer than they should have," did not rise above a suspicion or scintilla. *See Joske v. Irvine*, 91 Tex. 574, 582–83, 44 S.W. 1059, 1063 (1898). We so hold because he failed to state a maximum frequency or period beyond which no reasonable practitioner, similarly situated, would have continued the treatment. Probative evidence of such nature is indispensable in a proceeding of a "penal nature" such as the case in hand. *Neeley*, 574 S.W.2d at 245. With respect to its "promote and further" finding under conclusion number one, the Board did not receive evidence of a nature that would warrant separating one of its licensees from his livelihood. The remainder of conclusion one must be set aside.

■ Conclusion two must fall because the Board's witness wholly failed to testify that appellant "grossly over-prescribed narcotic drugs," either by using the foregoing words of Board Rule 382.19.21.001(8) or by employing language of an unmistakably similar import. The subject required expertise; no layman could validly conclude merely from being advised of the dosages administered that appellant not only had over-prescribed but had *grossly* over-prescribed.

■ Neither could the Board rely upon its own expertise. Although we are confident that certain members of the Board were persons highly qualified in the dental profession, their qualifications were not placed in evidence. Nor was appellant afforded an opportunity to cross-examine the Board as to any expert opinion that it may have entertained. Nothing is more thoroughly established than the proposition that neither a judge nor a juror may act as a witness. *Glasser v. United States*, 315 U.S. 60, 82, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942) (judge); *Gregory v. St. Louis Southwestern Railway Co.*, 377 S.W.2d 847, 853 (Tex.Civ.App.—Texarkana 1964), *rev'd on other grounds*, 387 S.W.2d 27 (Tex.1965) (juror). For us to hold that the Board may do otherwise would amount to the deprivation of cross-examination and the condonation of secret evidence. If a Board member desired to give his personal opinion, based upon his own professional expertise, that appellant had grossly over-prescribed, it was incumbent on that member to disqualify himself as a trier of the case and take the oath as a witness.

In its findings of fact and conclusions of law, the trial court below emphasized the total number of tablets prescribed, amounting to 882 separate dosages, and counsel for the State has argued a similar tack. Admittedly, the raw number would be impressive to any layperson. However, the number must be divided between three patients and over a substantial period of time. During a two-month period, patient Cook received 121 tablets, being at the rate of two per day. All other dosages were at a lower frequency. It does not strike us that two pain pills per day for a person suffering intense pain must inevitably be declared exorbitant.

To the contrary, witness Jeske paid no attention to the frequency of the dosage. His criticism centered upon the duration of the treatment. Did appellant administer these drugs for a grossly excessive period of time? Lacking expert testimony to this effect, we can only engage in conjecture.[4]

4. *Physician's Desk Reference* states: "The information concerning each product has been prepared, edited and approved by the medical department, medical director, and/or medical counsel of each manufacturer." *PDR* at 501.

It is stated that wherever the manufacturer has prepared an official package circular for distribution to pharmacists and to the medical profession, and the circular has been approved as to content by the Food and Drug Administration, then under FDA regulations, the " 'indications and usage, dosages, routes, methods, and frequency and duration of administration, description, clinical pharmacology and supply and

Lacking expert testimony, the Board could not so hold. Conclusion two is set aside.

 It is a well accepted principle of civil practice that the appellate court must both reverse and render when there is no evidence to support the judgment below. *National Life & Accident Ins. Co. v. Blagg*, 438 S.W.2d 905, 909 (Tex.1969). The "no evidence" rule does not mean utterly not a shred—it means no evidence of the minimal quantum that the law holds necessary to support a judgment. In short, the evidence must rise above suspicion and surmise and reach the level of a reasonably trustworthy basis for the action sought. *Joske*, 91 Tex. at 582–83, 44 S.W. at 1063. Because we have held that there was no substantial evidence to support the allegations that appellant gave narcotic prescriptions to three patients, which prescriptions were not necessary or required; or that he issued prescriptions that promoted and furthered addiction; or that appellant grossly over-prescribed such narcotics, we both reverse and render upon all such allegations. With respect to conclusions one and two, appellant is discharged.

 Turning to conclusion three, no expert testimony and no subjective evaluation of the evidence was required to demonstrate that appellant had indeed failed to note all of his narcotic prescriptions upon the dental records relating to patients McKay and Schultz. He admitted as much. However, the inquiry does not end there. It is the rare human who never commits a recordkeeping error. Patient McKay's penchant to appear without appointment when appellant was otherwise engaged and when the patient's records would be stored away might well serve to explain, but not necessarily justify, appellant's erratic recordkeeping with respect to this patient. We also note in passing that there were fewer omissions in the records pertaining to patient Schultz and no omissions in the records of patient Cook, neither of whom came to appellant until a later date. In view of our disposition of the alleged recordkeeping violations, we refrain from further comment upon the evidence relating thereto.

 We hold that the Board failed to apply the proper test. To warrant the punitive sanctions to which these proceedings were directed, it was insufficient for the State to merely show a failure, any failure, to comply with the recordkeeping rule and to rest. The evidence must rise to the level of professional misconduct. In other words, there must be evidence, free from reasonable doubt, of negligence, incompetence or wilful misconduct of a nature that threatens the public welfare if allowed to continue unchecked. We do not hold that expert testimony will be necessary when a recordkeeping violation is alleged. We do hold that the complaint and the findings of the Board should be couched in the foregoing language in order to make the record clear that due process has indeed been afforded to the respondent. Such was not done in this case.

 However, such is not the primary grounds of reversal. As we review the record, the Board found against appellant upon five allegations of misconduct pertaining to two patients and upon four allegations pertaining to a third patient, a total of fourteen separate allegations. We have struck down all but two of them, those remaining being the alleged recordkeeping violations pertaining to patients McKay and Schultz. Failure to maintain adequate records is obviously a lesser violation than the improper administration of drugs. The Board assessed only one punishment upon the fourteen counts found against appellant. We cannot assume that it would have

any relevant warnings, hazards, contraindications, adverse reactions, potential for drug abuse and dependence, overdosage and precautions'" must be repeated verbatim in *PDR*. *PDR* at 501.

As discussed in previous footnotes, the PDR discussion of Percodan contains generalized statements of precaution concerning this and all narcotic drugs. It also indicates the maximum frequency of dosage (generally, six hours).

However, there is no specific durational limitation whatever and no discussion as to the maximum period of time after which the medication must be discontinued. From all appearances, the manufacturer, and quite possibly the FDA as well, has not seen fit to issue specific warnings as to the length of time beyond which the administration of Percodan must be terminated. The matter has been left within the judgment of the practitioner issuing the prescription.

imposed the same punishment had it known that the more serious twelve of the fourteen would be held void. For us to affirm the entire punishment on the basis of the recordkeeping omissions would deprive appellant of those due process fundamentals which must be observed in professional license suspension and revocation proceedings. On authority of the Administrative Procedure and Texas Register Act, we reverse the findings of failure to record certain prescriptions of narcotic drugs to patients McKay and Schultz on the dental records pertaining to such patients. *See* TEX.REV.CIV.STAT.ANN. art. 6252–13a, section 19(e)(5), (6) (Vernon Supp.1985). Such allegations of professional misconduct are remanded to the Texas State Board of Dental Examiners for further proceedings consistent herewith.[5]

REVERSED and RENDERED in part; REVERSED and REMANDED in part.

5. The dissent has gone to some length to labor the obvious. Of course, this appeal is governed by the substantial evidence rule and the agency decision must stand if reasonable minds could have reached a similar conclusion. *Dotson v. Texas Board of Medical Examiners*, 612 S.W.2d 921, 922 (Tex.1981). The question remains: Substantial evidence of what?

Obviously, substantial evidence that Percodan contains a narcotic substance would be insufficient without evidence that the drug was, in fact, prescribed or administered. Neither would mere evidence, however substantial, that the drug was prescribed in some amount to some patient suffice. The medication is widely acknowledged as efficacious. The record must contain evidence, substantial in form, that the drug was not only administered but mal-administered. Without substantial evidence of mal-administration, the prosecution founders.

The qualifications of expert witness Jeske are acknowledged as impressive. However, his testimony was all subjective; he repeatedly attached the limiting phrase "in my opinion" to his testimony; he testified as to the manner in which he personally would have treated the patients. The fact that these patients did not receive the treatment that a renowned expert would have given proves nothing; the substantial evidence rule was not satisfied thereby. Discipline may not be imposed for failure to follow the highest standards of the profession; such a test is no test at all for reason that instances can be developed whereby any licensee could be held guilty of misconduct. Discipline is not imposed for the failure to achieve high standards; it is imposed for the failure to observe minimum standards.

ENOCH, C.J., and WHITHAM, DEVANY, McCLUNG, ROWE, BAKER and THOMAS, JJ., join in the opinion of the Court.

McCRAW, J., dissents with opinion, in which STEPHENS, STEWART and LAGARDE, JJ., join.

HECHT, J., did not participate in the decision of the case.

McCRAW, Justice, dissenting.

I respectfully dissent. The majority has misapplied the proper standard of review to be used by the court hearing an appeal from the revocation of a professional license. After a review of the statement of facts and application of the appellate review standard, I must conclude that the rulings of the Texas State Board of Dental Examiners and the 95th District Court should be affirmed.

Particularly in view of the fact that none of the patients was examined or interviewed, the testimony of the expert witness Dr. Jeske, in order to be actionable, had to declare that no reasonably competent practitioner similarly situated would have treated these patients in the manner shown by appellant's records. Lacking such testimony, there was no substantial evidence of intolerable conduct. At most, there was no more than substantial evidence of a failure to observe high standards. Such evidence failed to show actionable misconduct.

The expert further acknowledged, both on direct and cross-examination that he was giving only his opinion and that his opinion must be qualified by the fact that he never saw the patients. A dichotomy as to whether the patients received treatment of optimal quality does not meet the test. The substantial evidence rule is not satisfied without proof of professional misconduct clearly rising to the level of negligence, incompetence or wilful misconduct. The subjective nature of the testimony before us distinguishes this case from *Balla v. Texas Board of Medical Examiners*, 693 S.W.2d 715, 716 (Tex.App.—Dallas, writ ref'd n.r.e.) (physician prescribing weight-reduction drugs without ever seeing patients). The *Balla* expert testified that the procedure employed "would not be accepted medical practice." The dissent has made no effort to distill any such evidence from this record. Without substantial evidence to such effect, the charges against appellant Sizemore must fail. *Dotson*, 612 S.W.2d at 923 (suspension reversed where legitimate prescription drugs were prescribed in an allegedly non-therapeutic manner).

The Examining Board reached three conclusions in support of their order revoking Sizemore's license: (1) Sizemore prescribed controlled substances that were not necessary or required in the practice of dentistry and the prescription use would promote and further addiction in violation of Texas Revised Civil Statute article 4551h;[1] (2) Sizemore exhibited dishonorable conduct by grossly over-prescribing narcotic drugs in violation of article 4549; and (3) Sizemore failed to make the prescription of narcotic drugs a part of his patient's dental records.

Hearings and the appeal from hearings on disciplinary actions against dentists is governed by article 6252–13a, the Administrative Procedure and Texas Register Act. TEX.CIV.STAT.ANN. art. 4549, § 4(b) (Vernon Supp.1987). The scope of judicial review is defined in article 6252–13a, sec. 19(e):

The scope of judicial review of agency decisions is as provided by the law under which review is sought.... Where the law authorizes review under the substantial evidence rule, or where the law does not define the scope of judicial review, the court may not substitute its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion but may affirm the decision of the agency in whole or in part and shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced....

The substantial evidence test is applicable in the present case. The test is set out in *Dotson v. Texas Board of Medical Examiners*, 612 S.W.2d 921, 922 (Tex.1981):

The correct substantial evidence rule test is whether the evidence as a whole is such that reasonable minds *could have* reached the conclusion that the agency *must have* reached in order to justify its action.

(Emphasis added). This test has been used consistently in Texas courts. *See Imperial American Resources Fund v. Railroad Commission of Texas*, 557 S.W.2d 280, 286 (Tex.1977); *Balla v. Texas State Board of Medical Examiners*, 693 S.W.2d 715, 716 (Tex.App.—Dallas 1985, writ ref'd n.r.e.); *Kelley v. Texas Real Estate Commission*, 671 S.W.2d 936, 939 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Wood v. Texas State Board of Medical Examiners*, 615 S.W.2d 942, 943 (Tex.Civ.App.—Fort Worth 1981, no writ); *Thompson v. Texas Board of Medical Examiners*, 570 S.W.2d 123, 130 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.); *Korndorffer v. Texas State Board of Medical Examiners*, 448 S.W.2d 819, 823 (Tex.Civ.App.—Houston [14th Dist.]), *aff'd in part, reversed in part*, 460 S.W.2d 879 (Tex.1970). The examining board's order is deemed prima facie valid. *Imperial*, 557 S.W.2d 283; *Kelley*, 671 S.W.2d at 939; *Korndorffer*, 448 S.W.2d at 823. The burden of proof is upon the complaining parties to show an *absence* of substantial evidence and that the orders are unreasonable and unjust. *Imperial*, 557 S.W.2d 283; *see Kelley*, 671 S.W.2d at 939; *Korndorffer*, 448 S.W.2d at 823. When substantial evidence supports the board's decision, article 6253–13a, section 19(e) prohibits the reviewing court from substituting its judgment for that of the agency, even though the court may have "struck a different balance." *Kelley*, 671 S.W.2d at 939; *see Wood*, 615 S.W.2d at 943.

This court must review the entire record to determine if the Board's order is reasonably supported by substantial evidence. Dr. Arthur Jeske, an associate professor of pharmacology and restorative dentistry at the University of Texas dental branch in Houston testified for the Board. Jeske has a Ph.D. in pharmacology, a D.M.D. degree, and has published several papers. He recently co-authored a textbook entitled *Pharmacological Therapeutics in Dentistry*. His expertise was not challenged. Dr. Jeske testified that Percodan, a chemical relative of morphine, is a strong narcotic analgesic that relieves pain centrally. Percodan has an addictive quality and creates physical and psychological dependence by producing a state of euphoria in the user. Dr. Jeske stated that "if given in sufficient quantity for sufficient time, [Percodan use] can result in dependence of the patient psychologically to maintain a state of well-

1. All references are to Texas Revised Civil Statutes, unless otherwise noted.

being." Dr. Jeske evaluated the use of Percodan by a patient with temporal mandibular joint pain (TMJ). Dr. Jeske stated that the use of Percodan is not normal in the treatment of TMJ. It is usually treated with a combination of physical measures and occasional use of pharmacological measures, such as the use of muscle relaxants or anti-inflammatory analgesics. Percodan is not an anti-inflammatory analgesic.

The TMJ patient's prescriptions for Percodan commenced on September 10, 1981, through August 23, 1982. In Dr. Jeske testified "with a reasonable degree of medical certainty" that Sizemore prescribed controlled substances that were not necessary or required. He was especially impressed by the fact that Sizemore started the TMJ patient on Percodan in September and allowed two months to elapse during which time further prescriptions were issued and "no definitive dental therapy was performed to alleviate the problem." Sizemore himself admitted there was a problem with the treatment of the TMJ patient. The patient was given additional prescriptions for Percodan from February 28 through June 2, but received no treatment because he allegedly did not have time for the procedures. Sizemore admitted that he could have demanded that the patient come in to the office and suspend issuance of the prescriptions and "probably should have." He further admitted that "it's obvious that my judgment was not so good [in failing to demand that the patient have treatment]." Sizemore realized that he "may have been used by this person." This patient received 382 pills.

Another of Sizemore's patients had upper-anterior pain in his teeth. Sizemore gave the patient a prescription for Percodan and antibiotics. This regiment was continued for two months before the teeth were extracted. The patient received 121 tablets in this two month period. Dr. Jeske testified that the initial prescriptions may have been justified, but that two months was a "fairly long time" to maintain a patient on pain control and antibiotic. Dr. Jeske stated that the Percodan was probably unnecessary or not required after the first two weeks of therapy. Five days after the painful teeth were removed, the patient was again placed on Percodan and antibiotic for an additional two month period for a problem "of endodontic origin." Dr. Jeske stated that in his opinion the prescriptions became unnecessary or were not required after twenty-four days.

A third patient received prescriptions for Percodan on April 27, May 9, May 13, May 18, June 2 and June 16. No antibiotic was used in conjunction with the prescription. On June 2, amalgam restorations were performed. Dr. Jeske stated that in his opinion, the Percodan prescribed on May 9, 13, and 18 were not necessary or required. In five and one-half months this patient received 220 pills.

Sizemore admits that he failed to properly keep complete records on his patients. There is no evidence presented to controvert the fact that Sizemore did not record all the prescriptions he issued to his patients.

Upon a proper review of all the evidence, I would hold that Sizemore has not met his burden to prove the absence of substantial evidence. The prima facie presumption that the Board's order is valid has not been rebutted. Reasonable minds *could* have reached the conclusions that the Board reached. I would affirm the judgment of the trial court and the orders of the Board.